FILED
CLERK
8/24/2026
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DAVID GANZ and CHRISTINE GANZ,

*Plaintiffs*,

-against-

NASSAU COUNTY, NEW YORK, PATRICK RYDER, Individually and Officially, MARC TIMPANO, Individually, DAVID CAFARELLA, Individually,

*Defendants*.
-------------------------------------------------------------X

**OPINION AND ORDER**

25-cv-02283 (JMW)

**A P P E A R A N C E S:**

Amy L. Bellantoni
**The Bellantoni Law Firm, PLLC**
2 Overhill Road
Scarsdale, NY 10583
*Attorney for Plaintiffs*

Mohammad Tahir
**Nassau County Attorney's Office**
1 West Street
Mineola, NY 11771

Jonathan M. Bernstein
**Goldberg Segalla, LLP**
8 Southwoods Blvd, Suite 300
Albany, NY 12211

-and-

Scott R. Green
**Goldberg Segalla, LLP**
200 Garden City Plaza, Suite 520
Garden City, NY 11530
*Attorneys for Defendants*

**WICKS,** Magistrate Judge:

> *The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.*[1]

David Ganz ("Mr. Ganz") and Christine Ganz ("Ms. Ganz" and collectively, the "Plaintiffs") commenced this action, pursuant to 42 U.S.C. § 1983 against Defendants Nassau County, New York (the "County"), Nassau County Police Department ("NCPD") Commissioner Patrick Ryder ("Commissioner Ryder"), Lieutenant Marc Timpano ("Lt. Timpano"), head of the NCPD's Pistol License Section ("PLS"), and Nassau County Police Investigator David Cafarella ("Cafarella" and collectively with the County, Commissioner Ryder, and Lt. Timpano, the "Defendants").[2] Plaintiffs allege violations of the Second, Fourth, and Fourteenth[3] Amendments of the United States Constitution stemming from NCPD's and the PLS's firearm disqualification

[1] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26 (2022) (internal citations and quotation marks omitted).

[2] Plaintiffs have withdrawn certain claims against the individual defendants. (*See* ECF No. 31 at 1 n.1.) ("Plaintiffs withdraw their individual capacity claims against Parick Ryder ("Ryder"), as discovery revealed no evidence of his personal involvement. Plaintiffs do not withdraw their official capacity claims against Ryder, as he is the proper party to be named in connection with their declaratory and injunctive relief claims. Plaintiffs withdraw their individual capacity claims against Marc Timpano, as testimony reveals that he retired prior to September 2024 [].") Thus, it appears that Lt. Timpano should be dismissed as a party as he was sued "in his individual capacity only." (ECF No. 1 at ¶ 12.) Whereas, Commissioner Ryder remains sued in his official capacity, and Cafarella has always been sued solely in his individual capacity. (*See id.* at ¶¶ 10, 19.)

[3] While the Complaint does not contain a separate count for a Fourteenth Amendment violation, there are allegations of Fourteenth Amendment violations. (*See* ECF No. 1 at ¶¶ 25, 81.) However, Plaintiffs are not seeking summary judgment on the Fourteenth Amendment or on any other claims apart from the Second Amendment as it is absent in their motion papers and Plaintiff conceded to this at oral argument. (*See* Electronic Order dated 8/19/2026; ECF No. 34 at 8.) Thus, the claims are deemed abandoned. *See Williams v. Suffolk Cnty.*, 284 F. Supp. 3d 275, 284 (E.D.N.Y. 2018) ("Therefore, that claim is deemed abandoned … Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's … claims is granted."); *see also MacDonald v. Cnty. of Suffolk*, No. 2:22-CV-188 (NJC) (AYS), 2026 WL 1453872, at *1 (E.D.N.Y. May 22, 2026) ("Further, MacDonald failed to oppose Defendants' arguments for summary judgment on the state law negligence claim and is therefore deemed to have abandoned that claim.") As such, the Court need not address Defendants' arguments against the Fourth or Fourteenth Amendment.

policy. (*See generally*, ECF No. 1.) Before the Court are cross motions for summary judgment (ECF Nos. 26, 29), oppositions (ECF Nos. 31-32), and reply papers (ECF Nos. 34, 37). Oral argument on the motions was held on August 19, 2026. (*See* Electronic Order dated 8/19/2026.) For the reasons set forth below, Plaintiffs' Motion for Summary Judgment (ECF No. 26) is **GRANTED** in part and **DENIED** in part, and Defendants' Motion for Summary Judgment (ECF No. 29) is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

The following facts are gleaned from the parties' Local Rule 56.1(a) Statements and are uncontested unless otherwise noted.[4]

### *I. The Parties and the Pistol Licenses*

The Plaintiffs are residents of Nassau County, New York and have held New York State pistol licenses since 2020. (ECF No. 32-8 at ¶¶ 1-2.) The licenses were issued to Plaintiffs by the

[4] The facts set forth above are taken from the parties' respective Rule 56.1 statements and corresponding responses. *See* ECF Nos. 26-9 (Plaintiffs' 56.1 statement), 31-9 (Plaintiffs' counterstatement of facts) and 32-8 (Defendants' 56.1 responsive statement and statement of additional facts). The Court will not reference ECF No. 29-10 which is labeled as Defendants' 56.1 statement but appears to be Plaintiffs' 56.1 statement instead.

Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may also cite directly to an underlying document. The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal. *See Stewart v. Fashion Inst. of Tech.,* No. 18-CV-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03-CV-2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). "Additionally, to the extent [a party's] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such] statement[s.]" *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020).

NCPD PLS. (*Id*. at ¶ 3.) The PLS is an administrative agency in pistol licensing that decides on a case-by-case basis whether to suspend an individual's pistol licenses. (ECF No. 31-9 at ¶ 85; ECF No. 32-8 at ¶ 42.) Cafarella has been employed as an investigator with the PLS since 2022. (ECF No. 31-9 at ¶ 86.) When Cafarella arrived in the PLS, his supervisors included Sergeant William Russell ("Sgt. Russell") and Lt. Timpano, who retired in approximately August 2024. (*Id*. at ¶¶ 87-88.)

### ***II. Plaintiffs' Daughter's Mental Health Incident***

In February of 2024, the Plaintiffs' daughter, who was enrolled in the SUNY Old Westbury College ("SUNY"), was admitted to a Massachusetts hospital for mental health treatment. (ECF No. 32-8 at ¶¶ 8-9.) In September 2024, a patient at the Massachusetts hospital contacted the SUNY school to report that Plaintiffs' daughter had drawn threatening images. (*Id*. at ¶ 10.) Plaintiffs' daughter was then transported by the NCPD to Nassau University Medical Center. (*Id*. at ¶ 12.) Plaintiffs' daughter informed the police that the picture was not depicting any type of shooting or threat. (*Id*. at ¶ 11.)

The SUNY college and its police force, after having been informed of the accusation, handled the school-threat investigation. (*Id*. at ¶¶ 35-37, 40, 41.) However, NCPD officers responded to Plaintiffs' home to ascertain the daughter's condition. (*Id*. at ¶¶ 36, 40, 41.)

### ***III. The Investigation***

Plaintiffs came to Cafarella's attention on September 18, 2024, after beginning his review of a police incident report concerning the Plaintiffs' daughter. (ECF No. 31-9 at ¶ 91; ECF No. 32-8 at ¶¶ 6-7.) This was a result of Nassau County being notified by SUNY Old Westbury Administration that Plaintiffs' daughter was accused of drawing disturbing pictures of mass shootings. (*See* ECF Nos. 32-1 at 6; 32-2 at 7.)

According to Cafarella, the PLS is responsible for background investigations for new applicants and for investigations into when issues arise from police interaction or other events involving current licensees. (ECF No. 31-9 at ¶ 89.) Cafarella testified in his deposition that, unless the matter involves an arrest, the mere fact that an assignment is entered into the PLS assignment system does not mean that a suspension determination has already been made. (*Id.* at ¶ 90.)

Cafarella reviewed a written report indicating that a supervisor from the 1st Precinct verified that Plaintiffs' weapons were secured in a safe and that their daughter did not have access to them. (ECF No. 32-8 at ¶ 14.) The report also indicated that Plaintiffs were pistol license holders, and that they "refused to surrender" their weapons. (*Id*. at ¶ 16.) A lieutenant in the NCPD Homeland Security Unit, who was part of the daughter's investigation, advised the PLS that since there was "no direct message threatening a shooting," he saw no issue with Plaintiffs remaining in possession of their secured firearms. (*Id.* at ¶¶ 17-18; *see also* ECF Nos. 32-1; 32-2; 32-3 at 28.) Despite that, Cafarella considered Plaintiffs' daughter to be a member of Plaintiffs' household, suspended Plaintiffs' pistol licenses under the direction of then-Sgt. Russell of the PLS. (ECF No. 32-8 at ¶¶ 20-21.) This suspension was due to a "volatile mental situation" in Plaintiffs' house where a household member was hospitalized for mental health treatment, and because the Plaintiffs failed to notify the PLS of the hospitalization. (*Id*. at ¶ 22.) Defendants dispute the last sentence to the extent that it suggests the were no further reasons for suspension, "which also arose from the totality of circumstances under administrative review, including Plaintiffs' decision to place their daughter in an inpatient program and safeguard their weapons outside Nassau County." (*Id.*)

At no time during Cafarella's investigation between September 2024 and present date was it ever alleged that Plaintiffs' firearms were accessible by anyone other than themselves. (*Id*. at ¶ 24.) After Plaintiffs provided Cafarella with photos of the biometric safes that contained their weapons, Cafarella was satisfied that Plaintiffs' weapons were properly stored. (ECF No. 31-9 at ¶ 93; ECF No. 32-8 at ¶¶ 26-27.) Cafarella did not speak with Plaintiffs' daughter or the girl who made the accusation as a part of his investigation. (ECF No. 32-8 at ¶ 28.)

Plaintiffs contend that the PLS requires that when a licensee resides with a family member that has mental health treatment or was transported for mental health evaluation, the licensee must provide a letter from the treating physician that indicated that the family member is safe to reside in a house with firearms. (*Id*. at ¶ 29.) However, Defendants contend that instead under such circumstances, the PLS may request a letter from the treating physician or psychologist as part of a case-specific administrative investigation and that, where such a letter cannot be obtained, the matter is addressed on a case-by-case basis depending on the circumstances. (ECF No. 31-9 at ¶¶ 96-97; ECF No. 32-8 at ¶ 29.)

Cafarella required Plaintiffs to obtain a "letter of no objection" from their daughter's treating psychologist which stated their daughter's actual diagnosis. (ECF No. 32-8 at ¶ 30.) It had to also state that the doctor was aware that Plaintiffs hold pistol licenses and that the doctor had "no objection to firearms being in the house." (*Id*.) Cafarella testified that the daughter's mental state was relevant to the PLS review. (*Id*. at ¶ 31.) Cafarella also testified that the school-threat incident and public safety concerns were issues that the PLS sought to address as a part of its review. (*Id*. at ¶ 32.)

### *IV.* ***The Nassau County PLS Handbook and the Suspension***

Under the terms of the PLS Handbook (the "Handbook"), Plaintiffs' failure to notify PLS that a member of their household received mental health treatment was grounds for suspension.

(ECF No. 32-8 at ¶ 45.) Under the Handbook, "a pistol license may be suspended and/or revoked based upon evidence of any disqualification pursuant to the Handbook or applicable law, and that the policy of the Nassau County Police Department is to immediately suspend the pistol license of any licensee who violates any term or condition of the license or the Handbook and commence an investigation to determine whether the license should be revoked." (ECF No. 31-9 at ¶ 104.) "The Handbook further provides that the licensee is responsible for making timely notification to the PLS of any incidents or occurrences that may affect his or her standing as a licensee and that the licensee should not assume that other law enforcement agencies or officers will make such notification on the licensee's behalf. Unless otherwise specifically noted, such notifications must be made within three business days after occurrence." (*Id.* at ¶ 105.)

The Handbook lists a number of reasons to suspend an individual's pistol license including the report of any domestic situation involving a licensee where violence is threatened or alleged to have occurred in a domestic situation and failure to report to the PLS within 3 business days any domestic dispute involving a licensee and also involving police. (ECF No. 31-9 at ¶ 106; ECF No. 32-8 at ¶ 78.) The Handbook defines "good moral character," as having the essential character, temperament, and judgment to possess a weapon in a manner that does not endanger oneself or others. (ECF No. 31-9 at ¶ 103.) The Handbook also requires a licensee to report when either the licensee or a member of the licensee's household receives professional treatment for mental health issues. (ECF No. 32-8 at ¶ 80.) Failure to report to the PLS any domestic dispute involving the licensee and also involving police presence is also grounds for suspension. (*Id*. at ¶ 81.) Under the Handbook, it is not just the reporting requirement that is relevant to suspension, but the fact that a member of the licensee's household is receiving mental health treatment. (*Id*. at ¶¶ 83-84.) Nassau County does not maintain a policy under which the

mere fact that a household member receives mental-health treatment automatically warrants the suspension of an individual's license. (*Id*. at ¶¶ 83-84.) According to Defendants, the record therefore reflects a temporary, case-specific administrative suspension followed by reinstatement, not a permanent revocation of Plaintiffs' licenses, and that the suspension arose from the PLS's review of Plaintiffs' eligibility to continue having a license while failing to report the household-member mental health events. (ECF No. 31-9 at ¶¶ 119-20.)

Thus, pursuant to the policy, the Plaintiffs' pistol licenses were suspended due to (i) a volatile mental situation in their house where a household member was hospitalized for mental health treatment, (ii) failure to report their daughter's mental health treatment, (iii) failure to report that their daughter was seeing a therapist for mental health issues and (iv) failure to report their daughter's hospitalization for mental health issues. (ECF No. 32-8 at ¶¶ 22, 44.) In addition to the failure to report, Cafarella testified that the suspension of Plaintiffs' licenses was a result of a case specific approach based on the totality of the circumstances. (*Id*.)

### ***V. Surrendering the Firearms and the Duration of the Suspension***

On October 16, 2024, and October 19, 2024, Plaintiffs surrendered their firearms to federal firearms licensee ("FFL"), Dark Storm Industries ("Dark Storm"). (ECF No. 31-9 at ¶ 95; ECF No. 32-8 at ¶ 48; ECF No. 32-5.) Plaintiffs were unable to possess their handguns or purchase new handguns until the PLS lifted the suspension of their pistol licenses. (ECF No. 32-8 at ¶ 49.)

Cafarella testified that even if Plaintiffs' daughter is only at the house a couple of times a month, there was still a concern as to whether she can gain access to Plaintiffs' weapons. (*Id*. at ¶ 51.) However, Cafarella also testified that he did not consider Plaintiffs to be "dangerous" people or "… threats to public safety." (*Id*. at ¶¶ 54-55.) Cafarella continued Plaintiffs' suspension

because the PLS was "waiting to see what comes of [the daughter's] treatment and if there [were] any further incidents." (*Id*. at ¶ 59.)

In March of 2025, Mr. Ganz informed Cafarella that he was unable to obtain a letter from their daughter's treating physician as requested. (ECF No. 31-9 at ¶ 109; ECF No. 32-8 at ¶ 60.) Cafarella then updated then-Sgt. Russell and together, they reviewed the original documents and decided to wait a number of months before reinstating the license. (ECF No. 32-8 at ¶ 61.) Cafarella explained that there is not a concrete timeline for reinstating licenses. (*Id*. at ¶ 63.) Rather, the duration of the suspension is based on what both the investigator and supervisor feel comfortable with and is viewed on the totality of the circumstances. (*Id*. ¶¶ at 63-64.)

### ***VI. <u>Reinstatement of Firearms</u>***

On March 18, 2025, Mr. Ganz sent an email to Cafarella stating that there was no reason to impose the suspension because Plaintiffs "ha[d] not done anything wrong" and that Plaintiffs' daughter did not have access to their weapons. (*Id*. at ¶ 66.) On April 3, 2025, Plaintiffs went to Dark Storm to pick up their handguns but were prohibited from receiving them by the PLS. (*Id*. at ¶ 68.) In April of 2025, Cafarella recommended to then-Sgt. Russell that Plaintiffs sign an acknowledgement of wrongdoing as a condition of having their licenses reinstated. (*Id*. at ¶ 70.) Through counsel, Plaintiffs informed Cafarella that they would not sign any such form. (ECF No. 31-9 at ¶ 113; ECF No. 32-8 at ¶ 71.) Seven months later, on November 20th and 21st of 2025, Plaintiffs were issued a "verbal admonishment" for failing to notify PLS of police contact within 3 business days. (ECF No. 31-9 at ¶¶ 115-16; ECF No. 32-8 at ¶ 74.) Only after that, Ms. Ganz's pistol license was reinstated on November 20, 2025, and Mr. Ganz's license was reinstated on November 21, 2025. (ECF No. 31-9 at ¶ 117; ECF No. 32-8 at ¶¶ 75-76.)

### *VII. <u>The Instant Action</u>*

On April 24, 2025, Plaintiffs commenced this action against Defendants bringing claims for violations of Plaintiffs' constitutional rights under the Second and Fourteenth Amendments, specifically challenging the policy of the PLS based on the "conduct, condition, and/or firearms disqualification of a cohabitant." (*See* generally, ECF No. 1.) The Complaint included three claims for violations of the Second and Fourth Amendment, as well as *Monell* liability. (*Id.*) Defendants filed their Answer on December 5, 2025, which included fourteen affirmative defenses. (ECF No. 16.) Discovery in this action was completed as of February 6, 2026. (ECF No. 17.) Shortly after, the parties consented to the undersigned and commenced first steps in summary judgment motion practice. (ECF Nos. 18, 20, 22, 24.) Now, the cross motions for summary judgment are before the Court. (ECF Nos. 26, 29.) Plaintiffs move for summary judgment solely on the Second Amendment (*see* ECF No. 34 at 8), and request that the Court "declare that the challenged Nassau County PLS policies and the PLS Handbook violate the Second Amendment facially and as applied to Plaintiffs; permanently enjoin Defendants from continuing to enforce them; and order such further relief as the Court deems just and proper, including scheduling this matter for trial on compensatory and punitive damages." (ECF No. 26-10 at 14.) At the same time, Defendants seek to dismiss Plaintiffs' Complaint in its entirety. (*See generally*, ECF No. 29-9.)

## <u>THE LEGAL FRAMEWORK</u>

On a summary judgment motion, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the burden shifts and the nonmovant may defeat the motion only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002). The burden on summary judgment is considered a procedural issue and therefore the Federal Rules apply. Thus, unlike state court where the burden is on the movant, "Defendant need not make any affirmative *prima facie* showing on this motion for summary judgment, and may discharge its burden of proof merely 'by pointing to an absence of evidence to support an essential element of [Plaintiff's] claim.'" *Vasquez v. United States*, No. 14-CV-1510 (DF), 2016 WL 315879, at *5 (S.D.N.Y. Jan. 15, 2016) (internal citations omitted) (emphasis in original).

"The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts." *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted). The role of the court at the summary judgment phase is not to *resolve* disputed issues of fact but only undertake an analysis to *identify* whether triable issues of fact exist. *See Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021). That is, the court's function is "issue-finding," not "issue-resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)). *Au fond*, the Court's role is

to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing *Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

It is within this framework that the Court considers the cross motions for summary judgment.

## DISCUSSION

Defendants move for summary judgment on all claims. However, Plaintiffs conceded – both at oral argument and in their motion papers -- that their motion is in solely in support of their Second Amendment claim on liability. Accordingly, all other claims are deemed abandoned. (ECF No. 34 at 8.) *See Williams*, 284 F. Supp. 3d at 284 ("Therefore, that claim is deemed abandoned … Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's … claims is granted."); *see also MacDonald*, 2026 WL 1453872, at *1 ("MacDonald failed to oppose Defendants' arguments for summary judgment on the state law negligence claim and is therefore deemed to have abandoned that claim.")

### A. The Second Amendment

The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. While the Second Amendment confers an individual right to bear arms, this right is not unbridled or unlimited. *D.C. v. Heller*, 554 U.S. 570, 595 (2008). The individual right to bear arms, as interpreted by *Heller*, is incorporated into the Fourteenth Amendment through the Due Process Clause and therefore, is fully applicable to the States. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010). The Supreme Court provides a two-

step framework for analyzing whether a firearm regulation violates the Second Amendment. *Bruen*, 597 U.S. at 19-24; *Antonyuk v. James*, 120 F.4th 941, 964 (2d Cir. 2024). First, courts must analyze whether the "Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17; *Antonyuk*, 120 F.4th at 964. If the court finds that it does, the Constitution presumptively protects that conduct. *Bruen*, 597 U.S. at 17; *Antonyuk*, 120 F.4th at 964. At the second step, the burden shifts and the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19; *see Antonyuk*, 120 F.4th at 964. When establishing that a regulation is a part of the nation's historical tradition, the government need only identify a "well-established and representative historical analogue," rather than a "historical twin." *Antonyuk*, 120 F.4th at 971 (citing *Bruen*, 597 U.S. at 30).

Plaintiffs contend that their conduct – possessing handguns for self-defense – falls squarely within the plain text of the Second Amendment and that there is no historical tradition to justify the challenged policies. (ECF No. 26-10 at 7.) Defendants argue that their policy is constitutional as the suspension of Plaintiffs' pistol licenses was the result of a case-by-case review, rather than a policy that categorically prohibits individuals from obtaining firearms on the basis of a cohabitant's mental health treatments. (ECF No. 29-9 at 6-9.)

Here, neither party argues that Plaintiffs' right to bear arms is not protected under the Second Amendment. Thus, the presumption that this conduct is constitutionally protected attaches. So, a determination on whether Plaintiffs' Second Amendment rights were violated therefore turns on the analysis under the second step of the *Bruen* framework. That is, whether Nassau County's policy is part of the historical tradition that may limit or in this case, suspend

Plaintiffs' licenses, and Defendants bear that burden. *See Bruen*, 597 U.S. at 19; *Antonyuk*, 120 F.4th at 964.

New York's Penal Law § 400.00(11) which deals with the suspension and revocation of firearms provides that "a license may be revoked and cancelled at any time in the city of New York, and in the counties of Nassau and Suffolk, by the licensing officer, and elsewhere than in the city of New York by any judge or justice of a court of record. … In any instance in which a person's license is suspended or revoked under paragraph (a) or (b) of this subdivision, such person shall surrender such license to the appropriate licensing official and any and all firearms…." N.Y. Penal Law § 400.00 (11)(a)-(c). The Handbook provides that the Nassau County Police Commissioner is endowed with the exclusive authority to issue and revoke pistol licenses pursuant to N.Y. Penal Law § 400.00. (ECF No. 31-8 at 1, 21.) Further, under N.Y. Penal Law § 400.00(1), an individual is eligible for a pistol license only upon an investigation finding that the applicant is of good moral character. N.Y. Penal Law § 400.00(1). Chapter 1, Section I(2)(d) of the Handbook provides that it is "the policy of the Nassau County Police Department … to *immediately suspend* the pistol license of any licensee who violates any of the terms and conditions of the license or this Handbook." (ECF No. 31-8 at 22 (emphasis in original).) Such violations include but are not limited to…

> "[(d)] Report of any domestic situation involving a licensee where violence is threatened or alleged to have occurred or the existence of a volatile domestic situation and [(f)] Failure to report any of the following to the Pistol License Section within (3) business days: … any domestic dispute/disturbance involving a licensee and also involving police presence…. [(z)] A licensee's failure to comply with any of the regulations stated in this handbook."

(*Id.* at 22-25.) (internal citations omitted).

In *Rahimi,* the Supreme Court upheld a statute empowering the government to disarm individuals who are found to present a credible risk to the safety of others because the

disarmament of such individuals is rooted in the Nation's historical tradition of firearm regulation. *United States v. Rahimi*, 602 U.S. 680, 700-01 (2024) (holding that the challenge to a statute which bars someone from possessing a firearm if they are a credible threat did not survive and is thus, constitutional as it applied to the challenger). The characteristics of a cohabitant of an applicant for a pistol license may be considered to the extent that they provide insight into the applicant's own ability to be entrusted with a weapon, but a cohabitant's inability to possess firearms cannot in itself serve as a basis for prohibiting an applicant from obtaining a pistol license. *See Milau*, 2025 WL 1029394, at *8; *see also Antonyuk*, 120 F.4th at 1001.

As an initial matter, to the extent that Plaintiffs argue a judicial adjudicative process was required to suspend the licenses, that theory is misguided. (*See* ECF No. 31 at 8.) N.Y. Penal Law § 400.00(11) empowers the NCPD Commissioner to suspend or revoke a license. Indeed, Judge Garnett recently found the same. *See Flaifel v. New York City*, No. 24-CV-06838 (MMG), 2026 WL 866816, at *5 n.4 (S.D.N.Y. Mar. 30, 2026) (citations omitted) ("Plaintiff argues that *Rahimi* requires a prior finding by a court that an individual poses a credible threat to the physical safety of another person before a state may deny a firearm license. It does not. As the Second Circuit recently explained, *Rahimi* recognized legislatures could identify certain groups of people judged to be dangerous and prohibit them from possessing firearms.")

Second, at oral argument the Court sought further clarity of whether Plaintiffs' challenges as to the Second Amendment are facial challenges or as-applied challenges. "[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated ....[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Antonyuk*, 120 F.4th at 982–83 (internal citations and quotation marks omitted). "[A]n as-applied challenge ... requires an analysis of the facts of a

particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Higbie v. James*, 795 F. Supp. 3d 307, 335 (N.D.N.Y. 2025) (internal citations and quotation marks omitted). Plaintiffs focused on Defendants' conduct rather than the policy itself, i.e., the suspension, the cool-down period, the doctor's note requests. Notably, Plaintiffs conceded that the word cohabitant is absent from the Handbook. Therefore, while Plaintiffs conclusorily state in their papers that this is a facial challenge too, the Court finds that this is in fact an as-applied challenge through the conduct of the Defendants when suspending Plaintiffs' licenses.

Moving to the crux of the Second Amendment, the parties both attempt to compare and distinguish the instant matter with that of the *Antonyuk* and *Milau*. In *Antonyuk*, the Second Circuit vacated a district court's preliminary injunction against the enforcement of a provision requiring pistol license applicants to disclose the identities of their cohabitants as a part of assessing the applicant's own character. *Antonyuk*, 120 F.4th at 1000-02. There, the Court concluded that the cohabitant disclosure is consistent with background check procedures that have already been recognized as constitutional. *Id*. Crucially, the Court reasoned that the characteristics of an applicant's cohabitants may be used to determine the applicant's own ability to "be entrusted with a weapon and to use it only in a manner that does not endanger [him]self or others." *Id*. at 1001 (quoting N.Y. Penal L. § 400.00(1)(b)).

By contrast, Suffolk County's policy of denying pistol license applications because a cohabitant of the applicant is prohibited from possessing firearms was recently found to be unconstitutional. *Milau*, 2025 WL 1029394, at *9. There, the plaintiffs' pistol licenses were suspended after a domestic incident involving their son. *Id* at *4. Their son had a history of significant drug use, multiple arrests, and had recently threatened the plaintiffs with physical

violence. *Id*. Their licenses were ultimately cancelled after a subsequent domestic dispute. *Id*. at *3. While the parties in *Milau* acknowledged that the plaintiffs' son's misdemeanor rendered him ineligible to possess a firearm, statements provided by the plaintiffs regarding their son's erratic behavior served as the basis for the cancellation of the plaintiffs' licenses. *Id*. The court rejected Suffolk County's reliance on *Antonyuk* to justify this practice. *Id*. at *7-9. The court reasoned that *Antonyuk* supports that the characteristics of a pistol license applicant's cohabitants are relevant insofar as they provide insight into the applicant's own ability to possess a firearm. *Id*. at *8-9. However, *Antonyuk* does not support the proposition that an applicant may be prohibited from obtaining a pistol license simply because a cohabitant is prohibited from possessing firearms. *Id*. The court concluded that *Antonyuk* is "inapposite," and that there is not historical analogue to support Suffolk County's policy. *Id*. at *9.

Here, the PLS maintained Plaintiffs' suspensions on the grounds that they failed to submit a letter from their daughter's mental-health specialist, failed to provide information about their daughter's mental health history, and concerns surrounding Plaintiffs' prior application responses. (ECF No. 29-9 at 8-9.) This review is distinct from categorical disqualification described in *Milau.* Indeed, *Milau* had a written policy regarding suspension on grounds of a cohabitant. 2025 WL 1029394, at *2, 7.[5] Accordingly, *Milau* does not in itself provide a basis for deeming the PLS' case-by-case review unconstitutional.

Although *Milau* does not support the finding that the PLS policy is unconstitutional, more recent case law does. Notably, the suspension of a pistol license stemming from a similar case-by-case review was at issue in *Wysocki v. Nassau County, et al.* No. 23-CV-8790 (SJB)(AYS),

[5] In *Milau*, there was a dispute as to whether that was the current policy because at some point in 2022, the policy had changed. *Id.* at. *2. However, Defendants admitted that Plaintiff was still subject to that policy. *Id.*

2026 WL 1965726, at *3-5 (E.D.N.Y. July 7, 2026). In *Wysocki*, the plaintiffs' firearm licenses were suspended after they failed to provide letters from their daughter's mental health specialists and purchase particular kinds of safes to store their weapons. *Id.* The court held that the criteria for reinstating the plaintiffs' licenses did not stem from any law or policy, but from the defendants' own determination which was unsupported by any historical analogue. *Id*. at *5. Specifically, the court observed,

> [d]efendants present *zero* evidence that the PLS's actions are consistent with the Nation's historical tradition of firearm regulation. They provide no citation to law, tradition, or any other evidence, nor do they provide a particular historical analogy to match the practices employed against the Wysockis. Instead, they rely on *Rahimi*, which is inapposite. … Instead, it was based on the Wysockis' daughter's mental-health emergency and her danger to herself, based on firearms owned by others. And Defendants' ongoing refusal to return the firearms or licenses appears to be entirely arbitrary or unlawful—it is based not on any existence of mental health treatment or even current threat that the daughter poses to herself or others.

*Id.*

Here, Defendants likewise fail to identify a single historical analogue to support this case-by-case review. Their opposition is devoid of any justification that stems back to other consistent historical traditions or case law to draw from. In short, Defendants have failed to carry their burden under *Bruen*. Rather, Defendants focus on distinguishing its policy from that of *Milau* and conclude that its policy is justified under *Antonyuk*. (ECF No. 32-9 at 7-9.) This is not enough. Defendants cannot automatically suspend a license when it is based on a cohabitant's existence of a volatile situation and not that of the licensee. There is no historical analogue. Cafarella himself testified that he did not believe that Plaintiffs were dangerous people, nor did he find that they were threats to public safety. (ECF No. 32-8 at ¶¶ 54-55.) Furthermore, Cafarella found that Plaintiffs' weapons were securely stored. (ECF No. 31-9 at ¶ 93; ECF No. 32-8 at ¶¶ 26-27.) Relying on Plaintiffs' failure to provide requested documentation from their daughter's mental health professional as a basis for maintaining a pistol licenses suspension after

already finding that Plaintiffs pose no threat directly runs contrary to the Second Circuit's decision in *Antonyuk*. *Antonyuk* makes clear that cohabitant status is relevant to an individual's pistol license application insofar as it provides insight into the applicant's own character. *See Antonyuk*, 120 F.4th at 1001. And, at oral argument Defendants' sole attempt to articulate a historical analogue failed as Defendants focused on the character and fitness of a licensee. In other words, the reasonable inquiry that a licensee is of good moral character is not connected to a cohabitant's mental health circumstances.[6] Simply put, Defendants have the burden to overcome the presumption that Plaintiffs' individual conduct is not protected, which they failed to do.

**B. *Monell* Liability**

Having found that Defendants failed to overcome the constitutionally protected presumption of the Second Amendment, the issue of liability as to Nassau County must be analyzed next.

"[S]ection 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Greenidge v. Suffolk Cnty. Police Dep't*, No. 25-CV-03604 (SJB) (JMW), 2025 WL 2645549, at *2 (E.D.N.Y. Sept. 15, 2025) (quoting *Schuloff v. Queens Coll. Found., Inc.*, 165 F.3d 183, 184 (2d Cir. 1999) (internal quotation marks omitted)). Section 1983 provides in relevant part as follows:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983.

[6] At oral argument, Defendants for the first time raised an incident with Plaintiffs' daughter from 2017, which was allegedly not reported as another basis for suspension. However, that is not in the record.

A municipality is subject to liability under § 1983 when that government's policy or custom causes a constitutional violation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). A plaintiff may establish a policy or custom in one of four ways: "by alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those whom municipal employees will come into contact." *Aquino v. City of New York*, No. 16-cv-1577 (GHW), 2017 WL 384354, at *3 (S.D.N.Y. Jan. 25, 2017). "[A]bsent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see also Hall v. New York City Dep't of Corr.*, No. 22-CV-5738 (AMD) (MMH), 2022 WL 17811474, at *2 (E.D.N.Y. Dec. 19, 2022) (quoting *Halperin v. New York City Dep't of Correction*, No. 19-CV-6266, 2019 WL 6328775, at *2 (E.D.N.Y. Nov. 26, 2019)). Because *Monell* prohibits *respondeat superior* liability, "a plaintiff must demonstrate that through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Wysocki*, 2026 WL 1965726, at *7 (quoting *Agosto*, 982 F.3d at 97). "In order to prove *Monell* liability based on a custom theory, the plaintiff must establish an unwritten practice that is so widespread as to have the force of law." *MacDonald*, 2026 WL 1453872 at *13 (citations modified) (citing *Agosto*, 982 F.3d at 98).

Here, Defendants' contention that there was no policy because the review was "case-specific" fails, because it ignores the independent ways in which Monell liability is established, and the Handbook itself is a policy that serves as a basis for liability. (ECF No. 26-10 at 13-14;

ECF No. 31 at 14.) Second, Cafarella's testimony that the mental health status of a household member of a pistol licensee has served as the basis for suspending other individual's pistol licenses is sufficient for establishing a "persistent and widespread" custom. (ECF No. 26-10 at 13-14; ECF No. 31 at 14.) Finally, the suspension was carried out by officials with final policymaking authority over pistol licensing. (ECF No. 26-10 at 14; ECF No. 31 at 15.)

The Handbook contains a written policy that states,

> [a] pistol license may be suspended and/or revoked based upon evidence of any disqualification pursuant to this Handbook or applicable law. The policy of the Nassau County Police Department is to *immediately suspend* the pistol license of any licensee who violates any of the terms and conditions of the license or this Handbook and commence an investigation to determine whether or not the license should be revoked. Violations of the terms and conditions of the pistol license include, but are not limited to….

(ECF No. 31-8 at 22.)

Defendants' stated policy is to suspend immediately if a licensee violates the terms and conditions of the license or the Handbook.

The Handbook further provides that a licensee is required to report when "the licensee or a member of the licensee's household "receives professional treatment for mental health issues," "is admitted to any public or private hospital for the treatment of mental health issues" or "[a]ny incident involving a licensee where there is police response, whether it involves the licensee or any other resident or guest in or at their home or place of business. This includes police response to any location that is non-domestic whereby a licensee is the subject, witness or third party involved." (*Id.* at 31-32 (Handbook, Ch. 2 §§ F(13)–(14), (19).)

The remaining analysis is dependent on whether Cafarella's testimony is too speculative to serve as the basis for establishing that a custom exists. Recently, Judge Bulsara found that testimony stating that a license suspension based a cohabitant's mental health treatment "ha[ve]

happened" and "could happen" was not enough to establish a "general practice". *Wysocki*, 2026 WL 1965726, at *8 ("Nor have the Wysockis established that there is a general practice to interpret or implement the Handbook in the way it was implemented against them. … [The officers'] testimony is hardly as definitive as the Wysockis suggest, and certainly insufficient to sustain a *Monell* claim.")[7] Interestingly though, the above illustrates that this is *at least* the second time that a similar scenario has occurred.

Courts have routinely found that officer testimony is sufficient for establishing a custom or policy. *See, e.g.*, *Torcivia v. Suffolk County*, 17 F.4th 342, 355–56 (2d Cir. 2021) (finding that deposition testimony of a responding officer on the policy at issue was sufficient for a reasonable jury to conclude that it was the "standard procedure" of the County); *Kellner v. County of Nassau,* No. 21-CV-3990 (AMD) (ST), 2026 WL 879662 at *13 (describing that the defendant's statement conceding to a procedure in Court was sufficient to establish the existence of a Monell policy where defendant admitted to a "procedure . . . [f]or good or bad" that was followed in all cases); *Milau*, 2025 WL 1029394 at *11 ("Moreover, the testimony of multiple Suffolk County employees establishes the existence of a formal policy prohibiting an applicant from receiving a pistol license if he lives with someone who is prohibited from owning a firearm."). However, the officers affirmatively testified that a policy existed in the aforementioned cases unlike in *Wysocki*, where Judge Bulsara found the testimony too speculative. The following page excerpts of relevant portions from Cafarella's testimony and from the testimony of the investigating officer in *Wysocki*.

[7] The Court notes that the Plaintiffs in *Wysocki* have moved for reconsideration of Judge Bulsara's decision. (*See Wysocki*, Case No. 2:23-cv-08790(SJB)(AYS), ECF Nos. 43, 47.) However, that application is not fully briefed.

**Cafarella's Testimony**

33

grounds for suspension in -- withdrawn.

Under the terms of the handbook then, failure to notify the pistol license section that a member of the household has mental health treatment is grounds for suspension?

A Yes. It could be considered grounds for suspension.

Q Okay. And it has been grounds for suspension in the past?

A As far as I know, yes.

Q It was grounds for suspension for the Ganz's?

A Yes.

Q What was the first thing that you did when you received the information about the Ganz's in your mailbox?

A The first thing I did, I know I, I believe, within a couple of a days, I reached out to Mr. Ganz, just to go over the events.

I know I did ask him for a letter of explanation.

So generally, when we get

((ECF No. 31-4 at 33:1-25.)

**Scaglione's Testimony from *Wysocki***

*Scaglione* 60

the time in February of 2023?

A Who were my supervisors in the pistol license section?

Q Right.

A That would be Lieutenant Timpano and Sergeant Russell.

Q I'm going to say was it common or was it the practice generally in the pistol license section if there was a family member or cohabitant who had mental health issues or was suicidal or was transported for evaluation or was hospitalized or had some other disqualifying condition that the licensee's pistol licenses be suspended?

A That has happened, yes.

Q So can we agree then that there was an understanding and that's I guess what you were acting on in the pistol license section, that if there was a household member or cohabitant who was disqualified from possessing firearms or who had mental health issues that the pistol licenses would be suspended and

*Rich Moffett Court Reporting, Inc.*

(*Wysocki v. Nassau County, et al.*, No. 23-CV-8790(SJB)(AYS) (ECF No. 32-11 at 60:1-25.)

Scaglione 62

your training in the pistol license section that if a licensee lived with a person who had a mental health issue or was getting mental health treatment or was suicidal that the licensee's pistol license would be suspended and their guns would be confiscated?

A That could happen, yes.

Q Have you ever seen it not happen?

A I don't -- I don't remember.

(*Id.* at 62:1-12.)

The testimony in this case is less speculative than that proffered in *Wysocki*. Thus, this is more in line with those other cases that have relied on officer testimony. *See, e.g.*, *Torcivia*, 17 F.4th at 355–56; *Kellner*, 2026 WL 879662 at *13; *Milau*, 2025 WL 1029394 at *11. A policy or custom does exist. (ECF No. 31-4 at 33:1-25; *see also* ECF No. 31-8.)

Defendants' arguments as to a case-by-case review fail because it stems from their custom, nonetheless. Defendants' conduct – suspension due to a cohabitant's mental health treatment which was not reported – is causally connected to Plaintiffs' deprivation of their constitutional rights for thirteen months.[8] Indeed, the immediate suspension policy is

[8] While Plaintiffs no longer move for summary judgment on a Fourteenth Amendment claim or any due process claim, it is worth noting that "Courts in this district have held, and the Second Circuit has affirmed, that the NCPD's policy for the return of confiscated long guns provided inadequate post-deprivation process." *Kellner*, 2026 WL 879662, at *11 (collecting cases on the issue). This would likely be an issue as Plaintiffs immensely disagree with Defendants' "lengthy cool down period". (*See* ECF Nos. 26-10 12, 14; 31 at 9.)

problematic. It allows the PLS to suspend licenses and then take their time with "investigating" the circumstances that led to the suspension. The Handbook states, that the "policy of the Nassau County Police Department is to immediately suspend the pistol license of any licensee who violates any of the terms and conditions of the license or this Handbook and commence an investigation to determine whether or not the license should be revoked." (ECF No. 31-8 at 22 (Handbook, Ch. 1 § I (2).) Therefore, Plaintiffs have made the required showing for Monell liability. *See Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 417 (S.D.N.Y. 2008) (internal citations omitted) ("First, the plaintiff 'must prove the existence of a municipal policy or custom' that caused his injuries. Second, the plaintiff must establish a causal connection between the policy and the alleged civil rights violation.")

**C. Qualified Immunity**

The concept of qualified immunity "shields government actors, … from liability for actions taken in their official capacity — providing 'ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Sacaza v. City of New York*, 169 F.4th 363, 369–70 (2d Cir. 2026) (quoting *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017)). To determine whether a government official is protected, "courts consider: (1) whether the facts evince that the police officer violated a statutory or constitutional right; and (2) whether 'the right was clearly established at the time of the challenged conduct.'" *Id.* (citations omitted). "Courts may elect to address these elements in any order …." *O'Pharrow v. County of Suffolk, et al.*, No. 22-CV-3773-SJB-JMW, 2026 WL 1948851, at *6 (E.D.N.Y. July 6, 2026) (internal citations and quotation marks omitted) (citing *id.*).

"Under the 'clearly established' prong, the focus is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Matusak v.*

*Daminski*, 165 F.4th 702, 711 (2d Cir. 2026) (citation omitted). As to the second prong, "[e]ven if an [official] violated a plaintiff's clearly established rights, [the official] will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Shea v. Town of Brookhaven*, No. 2:21-CV-5696 (NJC) (LGD), 2026 WL 948364, at *27 (E.D.N.Y. Apr. 8, 2026) (quoting *Baltas v. Chapdelaine*, 153 F.4th 328, 335 (2d Cir. 2025)); *see also Matusak*, 165 F.4th at 711 (internal citation omitted) ("To that end, qualified immunity's protections apply 'regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' Any mistake, however, must be 'reasonable.'"). Likewise, "[q]ualified immunity is usually a game of find-that-case, but not always. Common sense still plays a role. This Court can examine, for example, whether qualified immunity applies based on the 'obviousness' of the alleged Constitutional violation—even in the absence of a controlling case exactly on point." *Seweid v. Cnty. of Nassau*, No. 21-CV-03712 (JMA)(AYS), 2024 WL 693981, at *14 (E.D.N.Y. Feb. 20, 2024).

Plaintiffs withdrew their individual capacity claims against Commissioner Ryder while maintaining their official capacity claims against him, "as he is the proper party to be named in connection with their declaratory and injunctive relief claims." (ECF No. 31 at 1 n.1.) Likewise, Plaintiffs withdrew their individual capacity claims against Lt. Timpano, as he retired prior to the relevant dates. (*Id.*) Thus, the two claims left are (i) the claim against Commissioner Ryder in his official capacity and (ii) the claim against Cafarella in his individual capacity. (*Id.* at 18.)

> Personal[ ]capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official[ ]capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. *see, e.g.*, *Ware v. City of Lackawanna*, 2009 WL 3464057, at *2 (W.D.N.Y. Oct. 21, 2009) ("It is settled that a suit against a municipal officer in his official capacity is functionally equivalent to a suit against the entity of which the officer is an agent.") Thus, [a]s long as the government entity receives notice and an opportunity to respond, an official[ ]capacity suit is, in all

> respects other than name, to be treated as a suit against the entity. And for that reason, courts routinely dismiss official capacity claims ... as redundant or duplicative of claims against the municipality itself.

*Andrews v. Town of W. Seneca*, No. 21-CV-746-LJV, 2025 WL 959658, at *12 (W.D.N.Y. Mar. 31, 2025) (most internal citations and quotation marks omitted) (dismissing claims against individual defendants in their official capacities as duplicative); *see also Schubert v. City of Rye*, 775 F. Supp. 2d 689, 699–700 (S.D.N.Y. 2011) (internal citations omitted) (dismissing official capacity claims) ("[w]here the governmental entity can itself be held liable for damages as a result of its official policy, a suit naming the legislators in their official capacity is redundant. … In other words, the injuries that Plaintiffs have allegedly suffered came as a result of an alleged official policy of the municipal entity.")

"[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." *Curry v. John Theos, et al.*, No. 24-CV-4603-GHW, 2026 WL 1948279, at *7 (S.D.N.Y. July 3, 2026) (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004)).

Cases analyzing the Second Amendment and whether regulations and policies are constitutional following *Bruen* have come to different conclusions on whether such regulations or policy may continue or whether violations did in fact occur. *See United States v. Hemani*, 146 S. Ct. 1677, 1698 (2026) (Jackson, J., concurring) ("…it is unsurprising that Bruen's test is vulnerable to inconsistent and arbitrary application, as judges draw different conclusions from the same historical evidence and reach divergent assessments of the same laws."); *see also Bruen*, 597 U.S. at 29 ("[W]e do *not now provide an exhaustive survey* of the features that render regulations relevantly similar under the Second Amendment[.]") (citation modified) (emphasis added); *see also Rahimi*, 602 U.S. at 741 (Jackson, J., concurring) ("This case highlights the apparent difficulty faced by judges on the ground. Make no mistake: Today's effort to clear up 'misunderstandings,' is a tacit admission that lower courts are struggling.") (citations omitted). It therefore follows, it would be quite harsh to hold individuals assessing a person's right to carry a firearm to a higher standard than those in the courts. *See Milau*, 2025 WL 1029394, at *11

("The mere existence of *Heller* . . . did not render every licensing scheme unconstitutional, and *Heller* was silent as to whether a cohabitant-based restriction like that at issue here would survive any level of scrutiny"). While the Second Circuit provides a thorough analysis in *Antonyuk*, the decision clearly leaves the exact bounds of officer discretion in connection with "licensing regimes" as an open question. *See Antonyuk*, 120 F.4th at 994-95. Simply put, until the law on the discretion of officers in firearm licensing regimes is clearly defined and settled, there is no clearly established right that has been violated in the qualified immunity context. *See Milau*, 2025 WL 1029394, at *10 (granting summary judgment to all individual defendants as to qualified immunity for the Second Amendment violation claim) ; *see also id.* (citing and describing *Torcivia v. Suffolk Cnty., New York*, 409 F. Supp. 3d 19, 38 (E.D.N.Y. 2019), *aff'd*, 17 F.4th 342 (2d Cir. 2021) ("[I]n *Torcivia* … another court in this District concluded that Suffolk County had an 'important interest in limiting the ability of those individuals who suffer from mental health issues or are involved in domestic incidents *to access firearms.*' The *Torcivia* court upheld Suffolk County's policy of revoking a pistol license when a licensee was transported by the SCPD to a mental health facility. … [This] supports the Court's position that, prior to *Bruen*, the constitutionality of the policy at issue here was not clear.")). Also, the record demonstrates that Cafarella suspended Plaintiffs' pistol *licenses under the direction of then-Sgt. Russell* of the PLS. (ECF No. 32-8 at ¶¶ 20-21.) It is apparent that Cafarella believed that his actions were reasonable and pursuant to the directions of his superiors. To hold otherwise would not allow police investigators to conduct their investigations without the fear of civil liability rather than determining the circumstances of a licensee properly. As Defendants put it, "[t]he same allegations against the individual defendants are indistinguishable from those asserted against the County." (ECF No. 37 at 1.)

Moreover, Plaintiffs' claim against Commissioner Ryder in his official capacity likewise fails. Courts have routinely dismissed official capacity suits against municipal officers when a claim against the municipality itself also exists on the grounds that the official capacity claim is redundant. *See Schubert,* 775 F. Supp. 2d at 700 (finding a claim against a mayor to be redundant to a claim against the municipality); *see also Carmody v. Vill. of Rockville Ctr.,* 661 F.Supp.2d 299, 329 (E.D.N.Y.2009) (internal citations omitted) ("Based on the foregoing, to the extent the individual defendants, McKeon and Burke, are being sued in their official capacities, any claims against them are 'merely duplicative of the action against the [Village].'") As the statutory licensing officer for Nassau County under N.Y. Penal Law § 400.00, Commissioner Ryder is an executive official endowed with direct enforcement authority over the PLS Handbook. (ECF No. 32-7 at 1.) As Commission Ryder serves in an official capacity in matters pertaining to the PLS Handbook, Plaintiffs' claim against him in his official capacity is thus, redundant to Plaintiffs' claim against Nassau County. Therefore, the official capacity claim against Commissioner Ryder is dismissed.

Accordingly, following "the general purpose of qualified immunity" which is "to provide government officials with the ability reasonably [to] anticipate when their conduct may give rise to liability for damages," rather than to reward "incompetent" conduct, the Court grants summary judgment as to the individual Defendants on the ground of qualified immunity. *McClarin v. City of New York*, No. 23-7310, 2026 WL 2015063, at *12 (2d Cir. July 13, 2026) (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 (1987)).

**D. Permanent Injunction**

"To obtain a permanent injunction, 'a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.' The

decision of whether to grant or deny permanent injunctive relief is an act of equitable discretion by the Court." *Superb Motors Inc. v. Deo*, 776 F. Supp. 3d 21, 107 (E.D.N.Y. 2025), *adhered to in part on reconsideration*, No. 23-CV-6188 (JMW), 2025 WL 2178194 (E.D.N.Y. Aug. 1, 2025), and *motion to certify appeal denied*, No. 23-CV-6188 (JMW), 2026 WL 130912 (E.D.N.Y. Jan. 19, 2026) (internal citations omitted); *see also Nastri v. Dykes*, 807 F. Supp. 3d 112, 130 (D. Conn. 2025) ("The standard for a permanent injunction is similar to the standard for a preliminary injunction, except that the moving party must show actual success on the merits, rather than a likelihood of success.") In order for a court to grant a permanent injunction, a party must satisfy each of the four factors:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Daniels v. Moores*, No. 24-30-PR, 2025 WL 883035, at *1 (2d Cir. Mar. 21, 2025) (internal citations omitted).

In order for the Court to grant a permanent injunction, Plaintiffs must establish all four of the above factors, which they cannot do here.[9] The second factor – that a remedy at law must be inadequate – is simply not met. Here, Plaintiffs endured a year-long suspension of their pistol licenses. (ECF No. 32-8 at ¶¶ 21, 75-76; ECF No. 31-9 at ¶ 117.) However, their licenses have

---

[9] It has been found that "[i]mpairment of constitutional rights can undoubtedly constitute irreparable injury." *Milau*, 2025 WL 1029394, at *9 (quoting *Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997)); *see Milau*, 2025 WL 957533, at *3 (finding irreparable harm for a Second Amendment violation). However, the Second Circuit has not yet ruled on whether a Second Amendment violation causes irreparable injury. In the context of injunctions, the Second Circuit "'presume[s] irreparable harm for alleged deprivations of certain constitutional rights,' namely in First, Fourth, and Eighth Amendment contexts, but . . . declin[es] to decide whether Second Amendment infringement presumptively causes irreparable harm." *Care One, LLC v. Nat'l Lab. Rels. Bd.*, 166 F.4th 335, 348 (2d Cir. 2026) (quoting *National Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 248 (2d Cir. 2025)).

been reinstated, and their argument that the County's policy remains and can serve as a basis for future unconstitutional suspensions, is not enough to grant a permanent injunction for an as-applied violation as found here. There are other adequate remedies for the thirteen-month suspension, namely, damages to be determined at trial. Also, there is no irreparable harm given that the licenses are reinstated. Accordingly, since there is an adequate remedy at law, that could adequately compensate Plaintiffs for their injury, the remaining factors need not be decided.[10]

## CONCLUSION

For the reasons set forth herein, Plaintiffs' Motion for Summary Judgment (ECF No. 26) is **GRANTED** in part and **DENIED** in part and Defendants' Motion for Summary Judgment (ECF No. 29) is **GRANTED** in part and **DENIED** in part. Having determined liability on Plaintiffs' Second Amendment Claim, trial on damages shall commence on **March 1, 2027, at 9:30 a.m.** The parties shall appear for an in-person Final Pretrial Conference on **November 30, 2026, at 10:00 a.m.**, and shall file a Joint Pretrial Order in accordance with the undersigned's Individual Practice Rules on or before **November 23, 2026**.

Dated: Central Islip, New York
August 24, 2026

**S O O R D E R E D:**

/S/ *James M. Wicks*
JAMES M. WICKS
United States Magistrate Judge

[10] The Court having declined to enter a permanent injunction notes that in *Wysocki* , the Plaintffs' firearms were revoked and Judge Bulsara found they were "entitled to an injunction requiring the return of their firearms and the reinstatement of their pistol licenses," which is entirely different than the facts at hand. 2026 WL 1965726, at *6; *see also Milau*, 2025 WL 1029394, at *6 , 9 (granting a permanent injunction for a facial challenge and finding that the formal policy "of denying pistol licenses to individuals who live with someone who is legally barred from possessing a firearm," was facially unconstitutional).